# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

---

THOMAS WAYNE EVENSTAD,

                                    Civil No.  17-4067 (JRT/DTS)

                        Plaintiff,

v.                                          **MEMORANDUM OPINION
                                    AND ORDER GRANTING
CITY OF WEST ST. PAUL, JENNY          PLAINTIFF'S MOTION FOR
HALVORSON, JOHN DOES 1-10, and        PRELIMINARY INJUNCTION**
JANE DOES 1-5,

                        Defendants.

---

Adele D. Nicholas, **LAW OFFICE OF ADELE D. NICHOLAS**, 5707 West Goodman Street, Chicago, IL  60630; Mark. G. Weinberg, 3612 North Tripp Avenue, Chicago, IL  60641; and Peter J. Nickitas, 431 South Seventh Street, Suite 2446, Minneapolis, MN  55415, for plaintiff.

Monte A. Mills and Clifford M. Greene, **GREENE ESPEL PLLP**, 222 South Ninth Street, Suite 2200, Minneapolis, MN  55402, for defendants.

Plaintiff Thomas Wayne Evenstad filed a motion for a preliminary injunction in this constitutional challenge against the City of West St. Paul, its mayor, and several Doe defendants (collectively, "the City").  Evenstad argues that a West St. Paul ordinance restricting sex offenders from residing within 1200 feet of schools, day care centers, and group homes (the "Ordinance") violates the Ex Post Facto Clause.[1]  The City's response

---

[1] Evenstad's initial pro se Complaint also alleged that the Ordinance violates the Equal Protection Clause and his procedural and substantive due process rights.  Because Evenstad did not advance these arguments in support of this motion, the Court declines to consider them at this time, but does not consider them waived.

that Eighth Circuit precedent forecloses Evenstad's argument is unavailing, because the Ordinance is significantly more restrictive than those upheld by the Eighth Circuit. Because Evenstad shows that the equities are strongly in his favor and that he is likely to succeed on the merits, the Court will grant his Motion for a Preliminary Injunction.

## BACKGROUND

The West St. Paul City Council passed the Ordinance in December 2016 by a unanimous vote. (Decl. of Peter J. Nickitas ("Nickitas Decl.") ¶ 3, Ex. 1, Sept. 29, 2017, Docket No. 17.) The findings and intent section of the Ordinance states:

> Repeat predatory offenders, predatory offenders who use physical violence and predatory offenders who prey on children and vulnerable individuals are predators who present a threat to the public safety. . . . It is the intent of this chapter to serve the city's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the city by creating areas around locations where children and vulnerable individuals regularly congregate wherein certain predatory offenders are prohibited from establishing a primary or secondary address.

IX West St. Paul City Code ("City Code")) § 97.01.

The public record surrounding enactment of the Ordinance, as made available by the City, is largely consistent with its stated intent. A memo prepared by the City's police chief in advance of the first reading of the Ordinance contrasted "the Council's desire to establish a business and residential growth direction" with forces that "tend to change neighborhood character overnight," including group residential housing and predatory offenders. (Decl. of Ben Boike ("Boike Decl.") ¶ 2, Ex. 2 at 22, Oct. 27, 2017, Docket No. 39.) The memo focused on the safety threat posed by "a rapid influx of

predatory offenders," and noted the chief's concern "about what is on the horizon when the state begins to deinstitutionalize those offenders currently being held in [civil] confinement." (*Id.*) The chief proposed "a safe-zone around those institutions where potential victims are likely to congregate," and explained that he had "considered varying differences including 1,000, 1,500 and 2,000 feet and found 1,200 feet to be a good balance in protecting the public's interest while still allowing areas where predatory offenders may reside." (*Id.* at 23.)

At the first reading of the Ordinance, the police chief's presentation included a "detailed account of predatory offenders and the risks and danger to our community." (Boike Decl. ¶ 1, Ex. 1 at 13.) Three council members spoke – one supporting of the Ordinance, and two wondering if it could be stricter – and a fourth voted to second the motion to approve the reading. (*Id.*) There was an opportunity for public comment at the second reading, but no one spoke. (Boike Decl. ¶ 3, Ex. 3 at 29.) The Ordinance was approved without further deliberation. (*Id.*) Neither the memo nor the meeting minutes reflect the City's reasoning for including group homes in the Ordinance or discussion of including offenders who victimized adults without individualized risk assessment.

As enacted, the Ordinance prohibits any designated offender from living within 1200 feet of schools, licensed day care centers, and state licensed residential care or housing with services establishments. (City Code § 97.03(A).) It also prohibits renting to such an offender. (*Id*. § 97.04.) Violations of the Ordinance may result in "a misdemeanor or administrative citation." (*Id.* § 97.03(D).) It excepts certain offenders – minors, those who offended and were convicted as minors, those living with family, those

domiciled in a restricted area prior to the Ordinance's enactment, and those domiciled in an area that becomes restricted due to a new facility.  (*Id.* § 97.03(E).)  Based on a map provided by the City, Evenstad estimates that the restrictions cover approximately 90% of the total area and as much as 95% of the residential area of the city.  (*See* Nickitas Decl., Ex. 1 at 5.)  The City submits that there are 69 rental units in unrestricted areas.  (Second Decl. of Ben Boike ("2d Boike Decl.") ¶ 5.)  The City does not dispute Evenstad's claim that 60 of those units are in a building that, as a matter of policy, does not rent to felons.

The Ordinance does not define "designated offender," but it defines "predatory offender"[2] by reference to two other sources:

> Any person who [1] is required to register as a predatory offender under [Minnesota Statute] § 243.166, or [2] has been convicted of a designated sexual offense, regardless of whether the adjudication has been withheld, in which the victim of the offense was less than 16 years of age.

(City Code § 97.02.)  Thus, the first category includes anyone who is required by the state of Minnesota to register as a sex offender.  Notably, the Minnesota registration requirement applies to offenders who victimized adults.  *See* Minn. Stat. § 243.166, subd. 1b.  The Minnesota registration requirement generally persists for ten years after an offender's release from confinement; as such, the Ordinance's residency restrictions apply to individuals in this category for ten years after their release.  *See* Minn. Stat.

---

[2] The prohibition on residency applies to "any designated offender."  (City Code § 97.03(A).)  So does the provision that applies to landlords.  (*Id.* § 97.04(C).)  But the exceptions section exempts certain "predatory offender[s]."  (*Id.* § 97.03(E).)  And the City Council's summary of the Ordinance says it applies to "new predatory offenders."  (Nickitas Decl., Ex. 1 at 4.)  The City stated at the hearing on this motion that the difference is of no legal significance.

§ 243.166, subd. 6. The second category includes anyone convicted of a "designated sexual offense" against a victim less than 16 years of age. The Ordinance defines "designated sexual offense" to include several state crimes, including first through fourth degree criminal sexual conduct, solicitation of children, incest, indecent exposure, or any of three child pornography crimes. (City Code § 97.02.) There is no time limitation for individuals in this category; as such, the Ordinance's residency restrictions for offenders who victimize children under 16 apply for life. *See id.*

Evenstad, 52, falls into the first category: he was convicted in 1999 of First Degree Criminal Sexual Conduct using force or coercion and causing personal injury to an 18-year-old victim. (Nickitas Decl. ¶ 3, Ex. 2 (Decl. of Thomas Evenstad ("Evenstad Decl.")) ¶ 2, Sept. 29, 2017, Docket No. 17.) On August 21, Evenstad was released from jail and moved into an apartment in a West St. Paul residence. (*See id.* ¶ 3.) Three days later, City police informed Evenstad's landlord that Evenstad was prohibited from living there and warned both that they would be subject to criminal charges if Evenstad did not vacate by September 5. (*Id.* ¶¶ 5-6.) The building is within 1200 feet of at least one day care center and two group homes. (*See* Nickitas Decl. ¶ 3, Ex. 3 at 1.)

On August 31, Evenstad filed a pro se complaint and motion for preliminary injunction. (Compl., Aug. 31, 2017, Docket No. 1; Mot. for Prelim. Inj., Aug. 31, 2017, Docket No. 3.) The next day, police agreed to give Evenstad until September 30 to vacate the duplex. (Evenstad Decl. ¶ 11.) After obtaining counsel, Evenstad filed the Motion for a Temporary Restraining Order and Preliminary Injunction that is now before the Court. (Ex Parte Mot. for Prelim. Inj., Sept. 29, 2017, Docket No. 13.)

## DISCUSSION

### I. STANDARD OF REVIEW

The Court considers four factors in determining whether to issue a preliminary injunction: (1) the likelihood that the moving party will succeed on the merits, (2) the threat of irreparable harm to the moving party, (3) the balance of harms as between the parties, and (4) the public interest. *See Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1036 n.2 (8th Cir. 2016) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

### II. LIKELIHOOD OF SUCCESS ON THE MERITS

"In balancing the equities no single factor is determinative." *Dataphase*, 640 F.2d at 113. As such, likelihood of success "must be examined in the context of the relative injuries to the parties and the public." *Id.* However, likelihood of success on the merits is the most significant factor in considering a preliminary injunction. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012).

#### A. Required Showing

The likelihood of success factor ordinarily requires the moving party to prove only a "fair chance of prevailing," which may mean "something less than fifty percent." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 730 (8th Cir. 2008) (en banc).

When the matter at issue is a law that was the product of "government action based on presumptively reasoned democratic processes," however, the moving party must show that they are "likely to prevail on the merits." *Id.* at 732-33. With a city ordinance, the question is "to what extent the challenged action represents 'the full play of the democratic process.'" *Id.* at 732 n.6 (quoting *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995)); *see also Johnson v. Minneapolis Park & Rec. Bd.*, 729 F.3d 1094, 1098 (8th Cir. 2013) (applying the "likely to prevail" standard to a park board's speech restriction).

Evenstad alleges that the Ordinance was passed by a unanimous vote of the City Council, signed by the previous mayor, and enforced under the current mayor, and that others in the City's government assisted in developing it. (Compl. ¶¶ 12-14.) The City submits evidence of the first and second readings of the Ordinance at council meetings and documents circulated prior to the first reading. (Boike Decl. ¶¶ 1-3, Ex. 1-3.) The Court finds that the Ordinance was enacted pursuant to a "presumptively reasoned democratic processes," if not a terribly deliberative one. As such, Evenstad bears the burden of showing that he is "likely" to prevail on the merits.

### B. The Ex Post Facto Clause

In support of his Motion for Preliminary Injunction, Evenstad argues that the Ordinance's restrictions on all "designated offenders," regardless of date of offense, are retroactive punishment prohibited by the Constitution's Ex Post Facto Clause.

Sex offender registration laws do not violate the Ex Post Facto Clause if they establish civil proceedings rather than criminal punishment. *Smith v. United States*, 538

U.S. 84, 92 (2003). To determine whether a law is civil or criminal, the court must ask: (1) Did the City intend to impose punishment? (2) If not, is the law "so punitive either in purpose or effect" as to negate the City's intention that it be civil? *Id.* (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)) (internal quotation marks omitted). Five factors, though neither exhaustive nor dispositive, are relevant to analysis of whether a law is punitive in effect. *Id.* at 97 (citing *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-169 (1963)). Courts must ask "whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Id.*

### 1. The Eighth Circuit

The Eighth Circuit has twice applied *Smith* to resolve Ex Post Facto challenges to sex offender residency restrictions, in both instances upholding the challenged laws.

First, in *Doe v. Miller*, the Eighth Circuit upheld an Iowa statute prohibiting sex offenders who had victimized minors from residing within 2000 feet of a school or day care. 405 F.3d 700, 704 (8th Cir. 2005). It concluded that the statute was not punitive because the legislature's intent was to protect the health and safety of Iowa citizens. *Id.* at 718-19. It then applied the five *Smith* factors to conclude that the law was not so punitive in effect as to negate the legislature's intent. *Id.* at 719-23. First, it rejected the argument that the residency restrictions amounted to the historical punishment of "banishment" because they did not "expel" offenders from the restricted areas altogether.

*Id.* at 719-20.  It did so despite the fact that the record showed that "the restricted areas in many cities encompass the majority of the available housing," and in smaller towns even a single facility "can cause all of the incorporated areas of the town to be off limits" to offenders.  *Id.* at 706 & n.2.  Second, it found that the statute's goal of "protecting the health and safety of children" outweighed its deterrent or retributive effects.  *Id.* at 720. Third, it noted that the restrictions imposed less disability or restraint than a civil commitment scheme the Supreme Court had approved.  *Id.* at 721.  Fourth, it found that the restrictions had a rational connection to a nonpunitive purpose.  *Id.*  Lastly, it found that the restrictions were not excessive.  Crediting trial testimony that "convicted sex offenders as a class were more likely to commit sex offenses against minors than the general population," the court stated that "[t]he absence of a particularized risk assessment [] does not necessarily convert a regulatory law into a punitive measure."  *Id.* at 721.

Second, in *Weems v. Little Rock Police Department*, the Eighth Circuit upheld an Arkansas statute prohibiting certain sex offenders from residing within 2000 feet of a school or day care.  453 F.3d 1010, 1012 (8th Cir. 2006).  The court began by looking to *Miller*, finding that:

> The Iowa statute differed from the Arkansas law in two principal ways.  The Iowa statute was narrower in that it applied only to offenders convicted of sex offenses against minors, while the Arkansas law applies to some sex offenses in which adults were victimized.  The restrictions of the Iowa statute affected offenders more broadly, however, because they applied to every sex offender convicted of an enumerated offense, without any individualized assessment.

*Id.* at 1015.   Specifically, the Arkansas law applied to offenders who received an individually-assigned risk level of three ("high risk") or four ("sexually violent predators"). *Id.* at 1012-13.  Risk levels are assigned by expert examiners, and, for level four offenders, by a sentencing court.  *Id.*  An offender has a right to request an administrative review and, if unsuccessful, to challenge an assigned risk level in court.  *Id.* at 1013.   The Court concluded that the legislature's intent was not punitive, in part because the restriction was passed as part of the state's overall registration scheme.  *Id.* at 1017.  And it concluded that the case-by-case risk assessment process put the Arkansas law "on even stronger constitutional footing than the Iowa statute."  *Id.* at 1017.  The court specifically noted that this "fine-tuning of the restriction addresses the principle concern of the dissenting judges who believed the Iowa statute violated the Ex Post Facto Clause."  *Id.*

### 2.  Persuasive Authority

Lacking direct support in the Eighth Circuit, Evenstad turns to analogous cases decided elsewhere in the intervening decade since *Miller* and *Weems* to argue that he is likely to prevail here.  While none of these cases are controlling, they offer persuasive authority in support of the proposition that courts are skeptical of schemes that are stricter than those upheld in *Miller* and *Weems*.

First, Evenstad cites a Sixth Circuit case holding that Michigan's sex offender statutory regime (which, as relevant here, prohibited registered sex offenders from living, working, or loitering within 1000 feet of a school) violated the Ex Post Facto Clause. *Does #1-5 v. Snyder*, 834 F.3d 696, 698, 706 (6th Cir. 2016), *reh'g denied* (Sept. 15,

-10-

2016), *cert. denied sub nom. Snyder v. John Does #1-5*, No. 16-768, 2017 WL 4339925 (U.S. Oct. 2, 2017).  Like the Arkansas statute in *Weems*, the Michigan law applied to offenders who victimized adults – but the court was concerned that the restrictions were based entirely on the crime of conviction rather than individualized assessment.  *Id.*  The court expressed particular concern that the classifications were not appealable.  *Id.* at 702-03.  It was also concerned about the restrictions on working and loitering, *id.* at 703, and the lack of evidence as to the efficacy of such restrictions, *id.* at 704-05.

Second, Evenstad discusses a Wisconsin district court case considering an ordinance that restricted offenders who had victimized children from living within 3000 feet of a prohibited location (including schools, day cares, parks, trails, playgrounds, places of worship, and athletic fields used by minors) and 500 feet of each other. *Hoffman v. Vill. of Pleasant Prairie*, 249 F. Supp. 3d 951, 954 (E.D. Wis. 2017).  Those not already living in the Village were banned altogether.  *Id.*  The court called the ordinance "nigh unprecedented in its punitive effect," *id.* at 958, comparing it unfavorably to the Iowa and Arkansas statutes.  *Id.* at 959-60 (noting in particular the lack of individualized assessment, lack of exemptions, and lifetime ban on residency).

Third, Evenstad turns to the Eleventh Circuit that considered a law prohibiting offenders who had victimized someone under sixteen from living within 2500 feet of a school.  *Doe v. Miami-Dade Cty., Fla.*, 846 F.3d 1180, 1182-83 (11th Cir. 2017).  The court affirmed denial of a motion to dismiss an Ex Post Facto challenge because the complaint sufficiently alleged that the county law created an affirmative disability (plaintiffs alleged that their homelessness resulted from the residency restriction) and

because the law was excessive in relation to its stated purpose (it contained no individualized assessment and applied for life).  *Id.* at 1185-86.  The court distinguished the ordinance from a less-severe, time-limited state residency restriction.  *Id.* at 1186.

Finally, Evenstad cites two state supreme court cases.  In *Commonwealth v. Baker*, the Kentucky Supreme Court overturned a state law barring all registered offenders from residing within 1000 feet of a school, playground, or day care.  295 S.W.3d 437, 439-441, 447 (Ky. 2009).  The *Baker* court was similarly troubled that the statute covered all offenders, regardless of their victim's age, and that it did not contain any sort of individualized risk assessment.  *Id.* at 444, 446.  And in *Starkey v. Oklahoma Dep't of Corr.*, the Oklahoma Supreme Court held that retroactive application of a state-law restriction on residency within 2000 feet of locations including schools, playgrounds, parks, and day cares violated the state constitution's Ex Post Facto Clause, in part because the extension took place without any individualized risk assessments.  305 P.3d 1004, 1026, 1028-30 (Okla. 2013).  That said, the Tenth Circuit reached the opposite conclusion based on the federal Constitution.  *See Shaw v. Patton*, 823 F.3d 556, 576-77 (10th Cir. 2016).  That court was not troubled by the lack of individualized assessment, in part because the plaintiff "has not shown that his own risk of recidivism is particularly low."  *Id.*

## C. Analysis

### 1.  Intent

To discern intent, courts "consider the statute's text and its structure to determine the legislative objective."  *Smith*, 538 U.S. at 92.  "[C]onsiderable deference must be

accorded to the intent as the legislature has stated it." *Id.* at 93. Here, the Ordinance states that its purpose is "to serve the city's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the city," with a particular focus on "children and vulnerable individuals." City Code § 97.01. Moreover, while the legislative record shows generalized discussion of the safety risks posed by offenders, it does not show consideration of the specific risks posed by offenders who victimized adults or specific dangers posed to vulnerable adults.[3] (Boike Decl. ¶¶ 1-2, Ex. 1 at 13, Ex. 2 at 22-23.) The Ordinance is triggered solely by underlying criminal offenses and may result in a criminal misdemeanor, but it is situated in the "General Regulations" title of the City Code. On the record before the Court, it appears that the intent of the City Council was to create a civil, nonpunitive regime.

### 2. Effects

The Court therefore turns to the Ordinance's effects to determine whether they are so punitive in nature as to negate the City's stated intent. Although the City argues that the 1200-foot restriction in the Ordinance makes it "less onerous" than the 2000-foot restrictions upheld in *Miller* and *Weems*, the Eighth Circuit's comparison of the Iowa and Arkansas statutes shows that the Court's analysis must go beyond the distance covered by the restriction. *See Weems*, 453 F.3d at 1015. The City's Ordinance is in actuality stricter

---

[3] Curiously, before turning to public safety, the police chief described predatory offenders and Group Residential Housing facilities together as "forces which . . . tend to change neighborhood character overnight," and noted the "adverse impact" of the "growing number" of such facilities. (Boike Decl. ¶¶ 1-2, Ex. 1 at 13, Ex. 2 at 22-23.)

than either of the two statutes the Eighth Circuit upheld because it consolidates multiple categories of offenders into one and applies an across-the-board restriction on residency near schools, day care centers, and group homes to each.  As such, new analysis is required.

### a.  Historically Regarded as Punishment

Under *Smith*, the first factor is whether the nature of the Ordinance has been regarded in our history and traditions as punishment.  *Miller* forecloses Evenstad's argument that the residency restriction is banishment.  The Eighth Circuit focused on the fact that the residency restriction in *Miller* did not prohibit offenders from being present during the day to hold that it was unlike banishment.  405 F.3d at 719-20.  Evenstad acknowledges that the Ordinance does not prohibit him from being present in the restricted areas, only from living in them.

### b.  Traditional Aims of Punishment

A related factor is whether the Ordinance promotes traditional aims of punishment.  Evenstad says that it advances all three traditional aims of punishment: incapacitation (because it keeps offenders away from certain locations), retribution (because its application is based on prior acts, not current assessments of danger), and deterrence (because the goal is to avoid recidivism).  His arguments as to deterrence and retribution are foreclosed by *Miller*, which acknowledged that residency restrictions could have a deterrent or retributive effect, but are nonpunitive to the extent that they are intended to protect the public rather than to reduce the offender's incentive to reoffend through imposition of negative consequences.  *See* 405 F.3d at 720; *see also Smith*, 538

U.S. at 102.  Evenstad's incapacitation argument is unique, but fails in part for the same reason and in part because offenders are not restricted from mere presence.

### c.  Affirmative Disability or Restraint

The next factor is whether the Ordinance imposes an affirmative disability or restraint.  The court in *Miller* explained that the degree of any disability or restraint must be considered in light of the law's "countervailing nonpunitive purpose" – the greater the legitimate objective, the more restraint is allowed.  405 F.3d at 720-21.  The court acknowledged that the Iowa statute "does impose an element of affirmative disability or restraint," but linked this factor together with the fourth and fifth factors to determine whether its degree was permissible.  *Id.*  Although the Ordinance includes group homes on the list of restricted facilities, its overall coverage (and therefore restraint) is not necessarily greater than what was at issue in at least some cities and towns in *Miller*.  The Court will therefore consider this factor together with the next two factors.

### d.  Rational Connection to Nonpunitive Purpose

The final two factors, which are closely related, are whether the Ordinance has a rational connection to a nonpunitive purpose, and whether its restrictions are excessive with respect to this purpose.  Evenstad argues that the Ordinance lacks a rational connection to its stated purpose (because it does not target offenders who victimized minors and is not supported by evidence) and is excessive with respect to the stated purpose (because the restrictions do not allow for individualized assessment).  To the extent that the Ordinance is coextensive with those upheld by the Eighth Circuit in *Miller*

-15-

and *Weems*, his argument must fail.  But the Ordinance at issue here is broader in important ways:  it is intended to protect more than just minors, it restricts offenders who victimized adults without an individualized case-by-case assessment, and it restricts residency near group homes.  As such, though *Miller* and *Weems* certainly guide the Court's analysis of these factors, they do not command an outcome.

The stated purpose of the Ordinance is "to serve the city's compelling interest to promote, protect and improve the health, safety and welfare of the citizens of the city," particularly "children and vulnerable individuals."  City Code § 97.01.  The record shows that the Ordinance was designed to address the City's concerns that predatory offenders "tend to change neighborhood character overnight," and that a "rapid influx" of such offenders "can quickly degrade a community's sense of safety."  (Boike Decl. ¶ 2, Ex. 2 at 22.)  This focus on "character" and "sense of safety" rather than actual safety is questionable, and even the reasonable goal of protecting vulnerable adults and the community writ large is significantly broader than the nonpunitive purpose of the statutes affirmed by the Eighth Circuit in *Miller* and *Weems*.  *See Miller*, 405 F.3d at 721 ("minimizing the risk of repeated sex offenses against minors"); *Weems*, 405 F.3d at 1017 ("minimizing the risk of sex crimes against minors").[4]

---

[4] *Cf. Vasquez v. Foxx*, No. 16-CV-8854, 2016 WL 7178465, at *5 (N.D. Ill. Dec. 9, 2016) ("protecting children from convicted sex offenders"); *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 775 (E.D. Tex. 2015), *aff'd sub nom. Duarte v. City of Lewisville, Texas*, 858 F.3d 348 (5th Cir. 2017), *cert. denied sub nom. Duarte v. City of Lewisville, Tex.*, No. 17-303, 2017 WL 3719031 (U.S. Oct. 30, 2017) (advancing "public safety and protection of the City's most vulnerable citizens, its children").

Admittedly, however, it is similar to a purpose affirmed as legitimate in *Smith*: "public safety, which is advanced by alerting the public to the risk of sex offenders in their communit[y]." 538 U.S. at 103. And states may make "reasonable categorical judgments that conviction of specified crimes should entail particular regulatory consequences," including registration and notification. *Id.* But the City has pointed to no case – in the Eighth Circuit or anywhere else – where a court held that residency restrictions were rationally connected to so broad a purpose as "promot[ing], protect[ing] and improv[ing] the health, safety and welfare of the citizens of the city."

Perhaps it is possible to read a more limited purpose to the Ordinance: protecting the safety of "children and vulnerable individuals."[5] But even this more limited purpose is broader than that of the statutes in *Miller* and *Weems* – and the City has not cited any cases where a court upheld a law restricting offenders from residing near group homes. Nor did the City consider any evidence that the same sort of "temptation and opportunity" posed by contact between children and sex offenders who victimized children, *see Miller*, 405 F.3d at 720, is posed by contact between vulnerable adults and sex offenders of all types.

---

[5] The City advanced this more limited purpose at the hearing on this motion, noting that an individual may be convicted of first degree criminal sexual assault under one of twelve subcomponents if he or she causes personal injury to a victim and knows or has reason to know that the victim is mentally impaired, mentally incapacitated, or physically helpless. *See* Minn. Stat. § 609.342(e)(ii). But the Ordinance does not distinguish the subcomponents of Section 609.342, or of any other predicate crime. As such, it is hard to see how the subcomponents of any particular crime of conviction play any role in determining whether the Ordinance's across-the-board restrictions on all offenders are rationally connected to the purpose of protecting vulnerable adults.

But with all that said, the Supreme Court has noted that a law "is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." *Id.* (distinguishing cases where the nonpunitive purpose is a "sham or mere pretext"). Evenstad does make a colorable argument that there is no rational connection between the stated nonpunitive purpose of protecting children and vulnerable individuals and the Ordinance's across-the-board residency restrictions, particularly in light of the City's consideration of "neighborhood character." But he has not demonstrated that he is likely to prevail in making the case that the City's stated purpose is a sham or pretext.

### e. Excessive in Relation to a Nonpunitive Purpose

Evenstad's case that the Ordinance is excessive in relation to its stated purpose, however, is strong. First, like the Arkansas statute in *Weems*, the City's Ordinance is harsher than the Iowa law because it includes offenders who victimized adults. Second, like the Iowa statute in *Miller*, the City's Ordinance is broader than the Arkansas law because it applies to every sex offender convicted of an enumerated offense without any individualized assessment. Third, unique among the laws considered in the cases cited by the parties, the Ordinance includes group homes among the restricted facilities.

With regard to the first two points, it is true that *Weems* forecloses Evenstad's suggestion that the Ordinance is excessive merely because it restricts offenders who victimized adults. *See* 453 F.3d at 1015. But it is also true that a crucial aspect of holding such a restriction constitutional is that an individualized assessment is required. *Id.* This is particularly relevant in an Ex Post Facto challenge, because an across-the-

-18-

board restriction is directly tied to an offender's prior conviction, not to any present threat to community safety. That is why the Arkansas law's appealable individualized assessment, and the resulting application of restrictions to only the most dangerous offenders, put it "on even stronger constitutional footing" than the Iowa statute. *Id.* at 1017. Like the Eighth Circuit, other circuit courts have stressed the importance of individualized assessment, treating laws containing across-the-board restrictions with skepticism. *See Miami-Dade Cty.*, 846 F.3d at 1185; *Snyder*, 834 F.3d at 702, 705. Indeed, of the four persuasive cases the City cites for support, only two (both from New York) discuss laws restricting offenders who victimized adults – and those laws included individualized assessments. *Wallace v. New York*, 40 F. Supp. 3d 278, 325 (E.D.N.Y. 2014)[6]; *Matter of Devine v. Annucci*, 150 A.D. 3d 1104 (N.Y. App. Div. 2017).[7]

The Minnesota sex offender regime already requires an end-of-confinement risk assessment to determine whether an offender has a low, moderate, or high risk of reoffense. Minn. Stat. § 244.052, subd. 3. Offenders have a limited right to request review of the assessment, though not to appeal it to a court. *See id.* at § 244.052, subd.3(i). It is undisputed that the Ordinance does not take that assessment into account.

------

[6] "Because the State registration requirements, and, by extension, the County and Town residency restrictions, rely on a 'particularized risk assessment' to ensure that the 'length and extent of' such regulations are tailored to this end, they are 'not excessive.'" *Id.* (quoting *Weems*, 453 F.3d at 1017).

[7] At the hearing on this motion, the City cited *Devine* as an example of a court upholding the application of a residency restriction to a level-one offender against an Ex Post Facto challenge, but the offender at issue there victimized a minor and the state law that applied to him restricted only offenders who victimized minors and level-three offenders who victimized adults. 150 A.D. 3d at 1105; N.Y. Exec. Law § 259-c(14).

The City argued at the hearing on this motion that even offenders assigned the lowest risk level pose at least some safety risk, but under Minnesota law all released offenders must be assigned to one of these three risk levels. *See id.* As such, the fact that an offender is not adjudicated zero-risk is a direct result of the crime of conviction. Even though the Ordinance does except certain offenders from its restrictions, neither the Ordinance nor the record of its enactment reflect any consideration of whether or how the City should take into account the state's risk assessment. The fact that the Ordinance does not do so – let alone the fact that the City did not even consider whether it should – cuts strongly in Evenstad's favor.

With regard to the third point, including group homes among the restricted facilities significantly increases the degree of restraint. The City's map of restricted areas reveals that there are 36 such facilities in the City and six more within 1200 feet of its boundaries. Entire swaths of the City are restricted only due to group homes, not schools or day care facilities. As such, this factor expands the restraint on offenders in a manner, if not a degree, that has not been considered by the Eighth Circuit. Although the *Miller* court acknowledged that the Iowa statute severely restricted living options for offenders, it did so as a side effect of its necessary operation. Here, by contrast, the Ordinance's restrictions on residency near group homes are outside the traditional operation of these sorts of statutes – and the resulting expansion in coverage is more reminiscent of the complete ban in *Pleasant Prairie* than the incidental effect in *Miller* or *Weems*. Again, neither the Ordinance nor the record of its enactment reflect any consideration of whether

or how the City should take into account the unique nature of group homes. This fact, too, cuts in Evenstad's favor.

Relatedly, the fact that *Smith*, *Miller*, and *Weems* all deal with state statutes and not city ordinances is worthy of mention. Again, in each instance the restrictions were part and parcel of the state's broader regularly regime – not a piecemeal addition layered on top. The *Weems* court specifically cited the fact that the residency restriction was enacted as part of a bill relating to registration as evidence of its nonpunitive nature. 453 F.3d at 1017. And the persuasive authority reviewed above reveals that courts are generally more skeptical of local restrictions than statewide restrictions. *See, e.g.*, *Miami-Dade Cty.*, 846 F.3d at 1185-86 (distinguishing a more-restrictive county ordinance from the state regime and overturning it); *cf. Wallace*, 40 F. Supp. 3d at 324-25 (distinguishing more-restrictive county and town restrictions from the state regime and upholding them). This fact also cuts narrowly in Evenstad's favor.

Finally, the Court notes that Evenstad has submitted some recent evidence that sex offender residency restrictions are ineffective at preventing recidivism. The City is of course correct that such research is insufficient to justify a holding that Evenstad is likely to prevail in an effort to overturn the state regimes upheld by the Eighth Circuit. But the evidence does lend support to Evenstad's case that the City's more restrictive Ordinance is excessive in relation to its stated purpose.

* * *

In sum, although the two factors related to whether the Ordinance takes the form of traditional punishment cut in favor of the City, the three factors related to whether the

Ordinance's restrictiveness is rationally related to its purpose cut in favor of Evenstad. Although it is a close call], the Court finds that Evenstad is likely to prevail on the merits.

## III.    OTHER FACTORS

The other three factors the Court considers in determining whether to grant a preliminary injunction are: (2) the threat of irreparable harm to the moving party, (3) the balance of harms, and (4) the public interest. *Dataphase*, 640 F.2d at 114.

Evenstad argues that he will suffer irreparable harm absent an injunction because he will likely be forced into homelessness, may lose his job, and could even go back to prison for a probation violation. The City concedes that eviction can be an irreparable injury when a party faces "the real threat of homelessness," *Greer v. Mehiel*, No. 15-CV-6119, 2016 WL 828128, at *9 (S.D.N.Y. Feb. 24, 2016), but disputes that such a threat exists here. In support, it submits evidence that there are 69 rental properties in the City available to designated offenders. (2d Boike Decl. at ¶ 5.) That fact nicely makes Evenstad's case that there are few places for him to live. Evenstad takes it further by noting that he contacted the 60-unit building the City lists as available and found that, in addition to being cost-prohibitive, it does not allow convicted felons to rent. The Court finds that Evenstad has shown he would suffer irreparable harm absent an injunction.

Next, Evenstad argues that the balance of harms is in his favor because the City would not suffer any harm from an injunction because his homelessness would be worse for the City than his residency there. The City responds that barring it from enforcing the Ordinance against Evenstad would undermine not only its health and safety goals, but its

very authority to govern.[8]   Because the Court believes Evenstad has shown that he is likely to prevail on the merits, it finds that the balance of harms cuts narrowly in Evenstad's favor.

Similarly, the public interest factor turns almost entirely on resolution of the merits – Evenstad says that all citizens have an interest in overturning unconstitutional laws, while the City says that the public has an interest in enforcing those that are constitutional.   The City additionally quotes *Weems* for the straightforward proposition that the public has an interest in protecting children from predatory offenders.   Even though that case says nothing about vulnerable adults, this point is sufficient for the Court to find that the public interest factor cuts narrowly in favor of the City.

Due to the risk of irreparable harm absent an injunction, however, the Court finds that these equities are strongly in Evenstad's favor.   Because Evenstad is likely to succeed on the merits and the equities are strongly in his favor, the Court will grant his Motion for a Preliminary Injunction.

## IV. SECURITY

Federal Rule of Civil Procedure 65(c) states that the Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been

---

[8] The City also argued that Evenstad would not suffer harm absent an injunction because the unit he was living in was an illegal rental unit.  Evenstad does not dispute that this was the case at the time of the City's filing, and the City does not dispute that it is no longer true. Because Evenstad is legally in the unit now, the Court considers this fact of no moment.

wrongfully enjoined or restrained." The "amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion." *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Engr's* , 826 F.3d 1030, 1043 (8th Cir. 2016) (citations omitted). The City has not objected to waiver of the bond requirement nor demonstrated any costs or monetary damages that may result from issuance of the injunction. Moreover, Evenstad seeks to vindicate an important constitutional right. Under the circumstances, the Court will exercise its discretion to waive Rule 65(c)'s bond requirement. If the City wishes to object, the Court will consider its motion and argument.

## V. CONCLUSION

This case presents a close call, primarily because of the Eighth Circuit precedents that guide the Court in this case. But the Court finds simply that West St. Paul has gone too far in the sweep of its Ordinance. No one disputes that a city has a strong interest in protecting its citizens. Indeed, a more narrowly drawn ordinance would likely pass constitutional muster. The addition of group homes to the restricted areas and the lack of individualized assessments as to risk, in the Court's view, severely impact the rights of Evanstad and others affected by the Ordinance and doom this set of restrictions.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  Plaintiff's Motion for Preliminary Injunction [Docket No. 13] is **GRANTED**.

2.  The security requirement of Federal Rule of Civil Procedure 65(c) is waived.

DATED: January 25, 2018
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court